In re Daniel **BROUCEK** a/k/a Pupler Distributing Co., Debtor.

No. SG 02–12883.

United States Bankruptcy Court, W.D. Michigan.

April 17, 2006.

---

Scott H. Hogan, Foster Swift Collins & Smith, PC, John T. Piggins, Miller Johnson, Grand Rapids, MI, for Debtor.

## OPINION

JO ANN C. STEVENSON, Chief Judge.

This matter comes before the court upon the Trustee's Objection to Claim No. 473. In making its decision the court has relied upon all pleadings filed by the parties, oral arguments, all evidence and testimony properly admitted, and the Affidavit of Daniel Broucek.

In the early 1990s Daniel Broucek ("Broucek") became involved in the electronic discount card business. After pouring the majority of his time and money into this business for several months, it failed to produce much income. In order to continue working on this venture and keep his head above water, Broucek decided to fabricate a phoney business venture to lure in "investors."

Existing only in his mind, never as a legal corporate entity, and born solely as a device to produce income for himself, Broucek started Pupler Distributing Company ("Pupler") in early 1993. Announcing that he had a business opportunity that would yield a high rate of return on a short term loan, it was not long before a number of people were interested in investing in the fictitious company.

Broucek initially believed that before the loans came due, his electronic discount card business would start turning a profit and the investors would be repaid. But in reality, Broucek's discount card business did not take off and he needed more money to pay the initial investors. By telling the same, or largely the same story, and guaranteeing the same rate of return, Broucek obtained more money from new investors, paid the first investors, and thus, a Ponzi scheme was born.

Just as growth for the sake of growth is the ideology of a cancer cell, so too is it the principle of greed. Broucek's Ponzi scheme quickly grew to proportions that even he never anticipated. "Investors" were lining up around the block and before Broucek knew it, his investment scheme had metastasized throughout the West Michigan community, spreading to hundreds of people and consuming millions of dollars.

As the Ponzi scheme was spiraling out of control, Broucek knew that with each transaction he lost money and that his obligation to creditors increased. The deeper his involvement, the more difficult it was to stop because the amount of debt increased and became harder and harder to repay.

To keep the Ponzi scheme from collapsing, Broucek kept very careful records. As he became more and more involved with the operation, and as loan transactions increased, more of Broucek's time was consumed with inputting and maintaining the accounting data. By 2001, the record keeping had become his full-time job.

Initially, interest rates offered by Pupler were in the range of 45–46% annually. Proving the old adage: "He who is greedy

is always in want,[1]" several investors became immune to this exorbitant rate of return, demanding even higher rates. In later years, interest rates to some investors skyrocketed to as much as 450% on an annualized basis. Additionally, some of the original investors requested commissions or finder's fees for referring other investors to Pupler. Typically commissions paid to these investors equaled one-fourth of the interest paid to the investors they found.

Amazingly, considering the large amounts of money involved, not one investor asked Broucek to produce any evidence of the "business" before or after turning over their money. No one requested documentation regarding the business, the shipping transactions, the sales contracts, nothing. This also astounded Broucek.

When I operated Pupler Distributing, I lived in fear that some creditor, or some third-person, would discover that the enterprise was a fraud. I figured that sooner or later someone was going to ask me for some type of documentation regarding these transactions, such as shipping documents for the alleged sales or contact information for the buyers and sellers ... If someone had probed more deeply ... I would have been unable to give them what they asked for. There was nothing to give them.

Affidavit of Daniel Broucek, Pg. 17, ¶ 65.

In order to pay the investors of the Ponzi scheme, Pupler maintained an account with Bank One N.A. ("the Bank") at its Breton Meadows Branch ("Breton Branch"). All funds transferred to and from Pupler flowed through this account.

Six investors[2] had accounts at the 44th Street Branch of Bank One ("44th Street Branch"). These investors would provide Broucek with money to invest in the form of official checks,[3] which he would deposit at the Breton Branch. Broucek would then issue checks of principal and interest to these investors from the Breton Branch Pupler account. These checks were given to Paolo Scalici, the "manager" of these investors' loans. Scalici took the checks to the 44th Street Branch and deposited them into each investor's account.

The Bank accepted these deposits and credited the investors' accounts in full. The Bank then electronically debited the investors' accounts and issued official checks payable to Broucek. These official checks were given to Mr. Scalici who presumably took them to Broucek who endorsed them with a deposit stamp and deposited them in the Breton Branch. There, the official checks were honored, and the investors would start the cycle again.[4]

This arrangement worked well for Broucek and the investors for several months, until the Ponzi scheme collapsed. On No-

1. Horace (Ancient Roman Poet, 65 B.C.—8 B.C.)

2. The court entered a Stipulated Protective Order on November 29, 2005 to protect customer information relating to Claim No. 473. As such, the names of the lenders and specific account information have been omitted.

3. Official checks are largely the same as certified checks, teller's checks, or cashier's checks in that they are certified funds.

4. This is a faithful narrative of how five of the six investors conducted business with Pupler. As for the sixth investor, funds were transferred from the investor's account electronically before the Pupler checks cleared, instead of cashiers checks being issued and transported by Scalici between the branches.

vember 7, 2002, Ronald Philpot, Corporate Security for the Bank contacted the FBI regarding the Bank's concerns about the Pupler account. Broucek filed bankruptcy on November 14, 2002. The United States filed a Complaint for Forfeiture In Rem ("Civil Forfeiture Action") against the Pupler account in the United States District Court for the Western District of Michigan on November 20, 2002.

The Complaint alleged that the Pupler account contained proceeds from mail and wire fraud in violation of 18 U.S.C. § 1341 and § 1343. Based upon a warrant issued by the United States District Court, the FBI obtained a check from the Bank in the amount of $6,072,802.69 which represented the balance of the Pupler account on the date of its seizure by the FBI. This amount also included the Bank's overdraft losses that totaled $678,295.81.

On January 31, 2003, the Bank filed a Verified Claim in the Civil Forfeiture Action. On June 4, 2003, the United States District Court entered an Order of Dismissal in the Civil Forfeiture Action in which the Pupler bank account was released to Thomas A. Bruinsma, Chapter 7 Trustee.

After the FBI seized Broucek's bank accounts, several state court actions were filed against the Bank by various investors who alleged that the Bank engaged in wrongdoing when its officers, employees, and agents encouraged the investors to loan money to Broucek and then assisted in the loan transactions.

The Bank filed a claim in the Bankruptcy Court against the Debtor on June 25, 2003 asserting an approximate secured amount of $1,500,000.00 and an unliquidated unsecured amount not to exceed $1,500,000.00. It predicated this claim in part upon M.C.L.A. § 440.4210, § 440.4207 and § 440.4208 which are the security interest and the warranty provisions of Article 4 of the UCC. The Bank has never brought legal action against the investors to recover the overdraft amounts.

The Trustee filed an Objection to the Bank's claim on February 1, 2005. The Bank filed a Reply to the Trustee's Objection and reduced the amount of its secured claim and transfer warranty claims to $678,295.81. This claim was based upon the damages arising from the failure of checks issued by the Debtor to clear following their deposit. The Bank also added a new unsecured claim for attorney's fees and other costs incurred in the state court actions totaling $309,987.68.[5]

The Bank argues that Broucek is liable for the overdraft charges pursuant to the Account Rules and Regulations ("Account Agreement") and also under the UCC because each time he endorsed an investor's check for deposit he represented and warranted that the check was not subject to any claim or defense in recoupment. MCLA § 440.3416 and § 440.4207. The Bank relied upon these representations and warranties, processed the checks, and paid certified funds into the Pupler bank account.

The Bank further argues that a breach of warranty occurred because Broucek was operating a criminal enterprise. The investors loaned money under false and fraudulent circumstances thereby having a defense to the instruments and/or a claim for recoupment.

However, as we are about to discuss, the investors did not issue the instruments in question, the Bank did. Although the in-

---

5. The Bank has since reduced this part of its claim to $60,490.48 for a total claim of $738,786.29.

vestors may have a defense to the instruments and possibly a claim for recoupment, the Bank does not.

### The Overdraft Losses

*Warranty Claims*

MCLA § 440.3305(1)(a)(ii) defines a defense and claim in recoupment as the right to enforce the obligation of a party to pay an instrument that is subject to the defense of the illegality which under other law would nullify the obligation of the obligor.

■ Under Michigan law, "all contracts which are founded on an act prohibited by statute are void." *Krause v. Boraks*, 341 Mich. 149, 155, 67 N.W.2d 202 (1954).

MCLA § 440.3416 states in pertinent part:

(1) A person who transfers an instrument for consideration warrants to the transferee and, if the transfer is by endorsement, to any subsequent transferee all of the following:

(a) That the warrantor is a person entitled to enforce the instrument.

(b) That all signatures on the instrument are authentic and authorized.

(c) That the instrument has not been altered.

(d) That the instrument is not subject to a defense or claim in recoupment of any party which can be asserted against the warrantor.

Similarly, MCLA § 440.4207 states:

(1) A customer or collecting bank that transfers an item and receives settlement or other consideration warrants to the transferee and to any subsequent collecting bank all of the following:

(a) That the warrantor is a person entitled to enforce the item.

(b) That all signatures on the item are authentic and authorized.

(c) That the item has not been altered.

(d) That the item is not subject to a defense or claim in recoupment (section 3305(1)) of any party that can be asserted against the warrantor.

■ MCLA § 440.3103(h) defines a "party" as a "party to an instrument." Therefore, the relevant warranty provided in MCLA § 440.3416(1)(d) and § 440.4207(1)(d) is that the transferred instrument is not subject to a defense or claim in recoupment from a person or entity who is a party to the check.

■ The Bank asserts that Broucek breached this warranty when he endorsed and deposited the checks issued by the investors. However, the investors never issued checks to the Debtor. They only issued certified funds. These certified funds were provided by the 44th Street Branch of the Bank. This made the 44th Street Branch the drawer of the funds. The funds were then deposited at the Bank's Breton Branch. This made the Breton Branch the transferee. The issuer of the funds was Integrated Payment Systems, Inc. ("IPSI") and the payor was Citibank.

Accordingly, when Broucek deposited the official checks, he warranted to the Breton Branch of the Bank that the official check was not subject to the defense or claim of recoupment by the 44th Street Branch of the Bank, IPSI or Citibank. None of these parties had a defense or claim in recoupment because none of these parties lent money to Broucek. Accordingly, the warranty was not breached.[6]

---

6. The same result applies to the sixth lender who was allowed to transfer funds electronically. The analysis differs because in that case there was no instrument. Therefore, there was no transfer of an item and Broucek did not breach any transfer warranties.

*Secured Claim*

The legal basis for the Bank's secured claim is MCLA § 440.4210 which states:

(1) A collecting bank has a security interest in an item and any accompanying documents or the proceeds of any of the following:

(a) In case of an item deposited in an account to the extent to which credit given for the item has been withdrawn or applied.

(b) In case of an item for which it has given credit available for withdrawal as of right, to the extent of the credit given whether or not the credit is drawn upon and whether or not there is a right of charge-back.

(c) If it makes an advance on or against the item.

In other words, the Bank argues that as a result of the credit ("the issuance of certified funds") granted by the Bank to the individual investors when they deposited the Pupler checks, the Bank holds a security interest in the certified funds to protect it in the event the original deposit is dishonored. The security interest attaches to the total amount of certified funds that can be traced back to the Pupler bank account, which equals at least $678,295.81.

MCLA § 440.4105(e) defines "collecting bank" as a "bank handling an item for collection except the payor bank." A payor bank is defined as "a bank that is the drawee on a draft." MCLA § 440.4105(c). The Bank was the drawer of the official checks because it caused the official checks to be issued. With respect to the Pupler checks however, the Bank was the payor bank because those checks were drawn from the Bank, thus making the Bank both the drawee of the checks and the payor bank. Broucek or Pupler was the issuer

of the checks and the investors were the transferees.

MCLA § 440.4215 states that an item is finally paid by a payor bank when the bank has settled the item without having the right to revoke the settlement. Issuing official checks is a final payment. When the Bank made final settlement on the Pupler checks by issuing certified funds, it became the payor bank. White & Summers, Uniform Commercial Code 302 (4th Ed.1995)(the exchange of an official check should be deemed to be final payment since a bank incurs direct liability on official checks and teller's checks to the same extent as it does on cashier's checks and certified checks).

The Bank also argues that pursuant to MCLA § 440.4107 a branch or separate office of a bank is a separate bank. If true, the Breton Branch would be the drawee bank of the Pupler checks while the 44th Street Branch would be the collecting bank. MCLA § 440.4107 states:

A branch or separate office of a bank is a separate bank for the purpose of computing the time within which and determining the place at or to which action may be taken or notices or orders shall be given under this article and under article 3.

Comment 3 to this section states in pertinent part:

Warranties by one branch to another branch under Sections 4–207 and 4–208 (each considered a separate bank) do not make sense.

Consequently, we find that other than for notice purposes, the separate branches of the Bank are not considered separate banks. In addition, all Bank branches have full access to all depositor account information regardless of the branch in which a depositor opened his account. We therefore find no basis for

treating the separate branches as separate banks.

This may seem like a harsh outcome for the Bank, especially when it could be argued that the Bank was as much a victim of Broucek's Ponzi scheme as anyone else. But just as any investor could have avoided victimization by stepping back from the torrent of greed engulfing West Michigan and asking a few questions, so too could the Bank have averted its dilemma by exercising the caution called for in its own Account Agreement. By waiting the required number of days for the Pupler checks to clear before issuing certified funds, the Bank could have been left with far fewer overdraft losses.

*Account Agreement*

The Account Agreement states:

**Non–Sufficient Funds (NSF)**

The Bank will not be liable for failure to pay or honor any item or withdrawal request unless it is drawn or requested against available funds credited to the Account at the opening of business on the day the item is presented for payment or the request is received. If the Bank pays an item or honors your request that overdraws your Account, you agree to pay the amount of the overdraft together with any fee and accrued interest immediately upon demand at the Bank's offices, whether or not you signed or requested the withdrawal or participated in the transaction creating the overdraft or received any benefit from the withdrawal creating the overdraft. The Bank may assess a fee for any item or withdrawal request that is returned due to insufficient funds or if paid causing your Account to be overdrawn and may assess an additional fee for overdraft balances that are not promptly repaid and/or charge interest for any overdraft on your account ... you agree to pay all costs and expenses, including attorney's fees, incurred by the Bank in the collection of any overdraft.

According to this section of the Agreement, the Bank can only be faulted for dishonoring an item if there is money in the account to cover it. In other words, the Bank is required by the Account Agreement to pay any item presented so long as there is money in the account. If the Bank pays an item without money available, the account holder is liable for the return of the funds advanced by the Bank plus any costs and fees.

In this case the accounts of the investors showed a false positive balance. This was because the Bank was crediting the investors accounts in full for checks that had not yet cleared, and then debiting the investors accounts for the amount it was issuing in certified funds. When the Ponzi scheme collapsed, the Bank found itself holding bank accounts that had been fully credited for checks that were suddenly worthless due to the seizure of the Pupler bank account by the FBI. It was also left holding the bag on the other end, because it had issued certified funds which it had no right to revoke or recover. These funds were sitting in the same bank account that was in the possession of the FBI.

We are not forgetful that the primary cause of the Bank's dilemma is the criminal enterprise conceived by Daniel Broucek. However, the Bank must take its share of responsibility. If the Bank had waited the requisite number of days as enumerated in the Account Agreement that it drafted, the balances would have been closer to the actual amount of money in the accounts. Presumably, the Bank would have stopped honoring checks long before it did. Likewise, had it not issued certified funds for deposits that had not yet cleared, it would still have that money

in its coffers or at the very least an argument under the UCC.

### The Claim for Attorneys' Fees and Other Costs

Through January 31, 2006, the Bank incurred $60,788.78 in attorney's fees and expenses involving legal proceedings due to Broucek's Ponzi scheme. Specifically, the Bank incurred attorney's fees and costs in defending several state court actions brought by various investors, in the Civil Forfeiture Action in the United States District Court, as well as in the bankruptcy court proceedings. Of this total amount, $58,738.65 in fees were incurred after the bankruptcy filing while $2,050.13 were incurred prior to the filing.

▮ The Bank argues that it is entitled to indemnification by Broucek for all its attorney's fees and costs as outlined in the Account Agreement accepted by Broucek when he opened the bank account.

The relevant section of the Account Agreement states:

> All expenses incurred by the Bank as a result of any legal proceeding affecting your Account including, but not limited to, court costs and attorney fees, may be charged against your Account or billed to you separately.

Certain investors brought suit against the Bank in state court asserting liability by the Bank due to the negligence and wrongful conduct of its officers, agents and employees who encouraged loaning money and then assisted in the loan transactions. This has nothing to do with the Pupler bank account itself and therefore we find it falls outside the purview of what was contemplated in this section of the Account Agreement.

▮ In addition, post-petition attorney's fees are allowed only if 1) there is a contractual or statutory basis for assessing fees against a debtor, and 2) the creditor's claim is sufficiently over-secured to cover its attorney's fees. 11 U.S.C. § 506(b).

▮ The Bank does not hold a secured claim. Consequently, it has no collateral. Therefore it can not have a secured claim with collateral having value sufficient to cover its attorney's fees.

However, to the extent the Bank has a pre-petition claim for fees and costs that are not related to its defense of claims by investors in state court, these are allowable pursuant to 11 U.S.C. § 502(b) as an unsecured claim.

### ORDER

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1. The Trustee's Objection to Claim No. 473 is sustained in part;

2. The Bank One secured claim for the amount of the overdraft charges is disallowed;

3. The Bank One claim for attorney's fees and costs related to the state court actions is disallowed;

4. The Bank One unsecured claim in the amount of $2,050.13 for attorney's fees and costs is allowed;

IT IS FURTHER ORDERED that a copy of this Opinion and Order shall be served pursuant to Administrative Order 2004–06 (Mandatory Electronic Filing) upon Michael S. McElwee, Esq., Thomas A. Bruinsma, Geoffrey A. Field, Esq. and Bank One, N.A.